UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10350JLT

_____
                                                                              )
DIANE SCOTT-JONES and JOHN E. JONES, JR.,           )
INDIVIDUALLY AND AS TRUSTEES OF THE 392-394    )
BOYLSTON COMMONS CONDOMINIUM TRUST,         )
       Plaintiffs                                                             )
v.                                                                                 )
                                                                              )
CHARLES A. PERKINS, JR., GARY M. DADDARIO, and  )
PERKINS & ANCTIL, PC                                            )
       Defendants                                                          )
_____)

## AFFIDAVIT OF JOHN E. JONES, JR.

I, John E. Jones, Jr., state upon personal knowledge as follows:

1. I am a meteorologist and the Deputy Director of the National Weather Service, U. S. Department of Commerce. My office is in Washington, D.C. and, typically I am in Washington or on official travel, domestic or international, during the work week.

2. All documents attached to our memorandum titled "Opposition to Defendants' Motion for Summary Judgment and Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment" are true and accurate copies of the originals.

3. My wife and I purchased (on September 1, 2000, for $422,000) and live in one unit of a two-unit residential condominium at 392 Boylston Street, Newton, MA. The second unit was purchased approximately one month later by Qing Lu and Yu Cheung. Each of the two sets of owners has a 50% share in the condominium and all are Trustees of the 392-394 Boylston Commons Condominium Association. There is no external condominium association to provide maintenance and upkeep, which must be decided and paid jointly by the owners of the two units from a budget of $160 per unit per month.

4. My wife and I own a second residence, a single-family home in the Maryland suburbs of Washington, DC, and, since September, 2000, have divided our time between our homes in Maryland and Newton.

5. We have no debt other than the mortgages on our two homes.

6. In August, 2003, while we were at our Maryland home, the owners of the second unit deposited a massive amount of illegal solid waste on the common area, in an effort to build up the side yard near their unit where previously there was a steep slope.

7. Upon our return in September, we attempted to resolve the dispute that arose from the second-unit-owners' unauthorized, illegal alteration of the common area. We requested arbitration but the owners of the second unit declined.

8. On December 18, 2003, the owners of the second unit filed a Preliminary Injunction in Aid of Arbitration in Middlesex Superior Court, represented by Marcus, Errico, Emmer, & Brooks, but subsequently refused to begin arbitration. During the calendar year 2004, we were billed over $50,000 by attorneys we retained who were unable to accomplish arbitration, a settlement, or other resolution.

9. One of the attorneys we retained, Henry Goodman, of Goodman & Shapiro, failed to reveal that he was formerly a partner at Marcus, Errico, Emmer, & Brooks. In June, 2004, Mr. Goodman, acting without our permission, joined Douglas Troyer in recommending that Middlesex Superior Court appoint Sheryl Sarkis of Meredith Management as receiver for our two-unit condominium instead of proceeding with arbitration. We now know that Mr. Goodman is a leader in the Community Associations Institute, and is well-known to Defendants Perkins & Anctil, as well as to Marcus, Errico, Emmer, & Brooks. Ms. Sarkis is well-known to the Defendants, who represent her.

10. Ms. Sarkis refused to speak with us or meet with us, she refused all routine maintenance, she refused access to our bank statements and other records, and she did not arrange for the removal of the illegal solid waste. She also refused to file any of the reports receivers are required to file with the Court.

11. We continued to pay $160 per month, despite Ms. Sarkis' refusal to provide the services for which the fee is intended. We requested copies of our records in letters accompanying our monthly check but Ms. Sarkis failed to respond.

12. In December, 2004, when the Defendants started a series of threatening letters in rapid succession regarding a disputed debt and imminent foreclosure, we became frightened. Because of the close connections among the attorneys with expertise in condominium law, we were unable to find an appropriate attorney.

13. After the Defendants' January 11, 2005, letter, I took as much work time as possible for attention to this case and for extra travel from my office in Washington, DC, to Newton, MA.

14. My wife and I are representing ourselves at great personal and professional costs. We have no legal training. We continue to search for attorneys but with no success.

15. After learning that Defendants mailed HSBC two different letters, both dated February 7, 2005, that appeared to threaten foreclosure, we began to call. We wrote a

letter on February 15, 2005 (Plaintiffs' Exhibit 4). Our calls initially went to a call center in India and later to an office in New York. My wife spoke with various persons who led us to believe they were conducting an investigation and had spoken with the Defendants and the City of Newton Tax Department. My wife was repeatedly told the Defendants and the Newton Tax Department said we failed to pay for "engineering work" on our property.

16. We finally received a written reply from HSBC on April 18, 2005 (Plaintiffs' Exhibit 5). My wife called to inquire about the statement "It was determined that the outstanding bill is your responsibility to pay." The letter instructed us to "contact Perkins & Anctil directly." My wife called and requested a detailed written report of the "investigation" and HSBC then retracted their statements that they conducted an investigation. On May 2, 2005, my wife was told that the letter from the Defendants was "very atypical" and "inappropriate" and that the HSBC employee who wrote the April 18, 2005 letter did so "on her own."

17. I did not give the Defendants my consent to their contact with HSBC Mortgage Corp., Inc. mortgage-holder for our home at 392 Boylston Street, Newton, MA and none of the Middlesex Court records gives express permission for the Defendants' contact with HSBC Mortgage Corp, Inc.

18. I did not give the Defendants my consent to mail a copy of the letters to HSBC Mortgage Corp., Inc. to the owners of the second unit in the two-unit condominium.

19. We called John Rosenthal, the President of Meredith Management Corporation, the property management firm listed in the June 24, 2004, Order appointing Defendants' client as receiver. Mr. Rosenthal stated he was not aware that Sheryl A. Sarkis had been appointed receiver. He expressed surprise that Ms. Sarkis would be offered and would accept such an appointment. At the time Defendants claimed we harassed Mr. Rosenthal, we had spoken with Mr. Rosenthal twice by telephone; sent one fax, at Mr. Rosenthal's request, with the Order appointing the Defendants' client as receiver; and sent one letter via first class mail. All communication with Mr. Rosenthal was brief and pleasant; we did not provide details regarding Defendants' client's performance.

20. In four hearings in Middlesex Superior Court (February 3, February 8, July 22, and December 16, 2005; transcripts available), Defendant Daddario and Ms. Sarkis have made false and inconsistent statements about the location of our condominium records and only vague statements about the amount of condominium money they were holding. At the July 22, 2005, hearing, Defendant Daddario stated "The Association has no money to speak of" (p. 26 of the transcript) but he presented no bank statement or other record to support that statement. We paid Ms. Sheryl A. Sarkis $6,226.96 from the start of her appointment on June 24, 2004, through December, 2005.

On Friday, April 7, 2006, my wife spent 3 hours in the office of the new receiver Peter Zimmerman, looking through poorly organized files and separating physically the

documents for copying. The copies were not made available until April 18, 2006, and my wife was required to return to Mr. Zimmerman's office and pay $96.16 to get the copies.

My wife was allowed to look at what she was told was Defendants' client's entire record. According to my wife, there is no document retaining the Defendants for any purpose or any record of telephone or electronic mail communication regarding the Defendants' hire. There is no topographic land survey in the records. There is no deposit of $25,000 from the owner of the second unit.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 8TH DAY**

**OF MAY 2006**

*/s/ John E. Jones, Jr.*
John E. Jones, Jr., Pro Se
johnejonesjr@comcast.net
392 Boylston Street, Newton, MA 02459
617-558-3522